# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JULY SESSION, 1997

FILED

April 23, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9806-CR-00162** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **DAVIDSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. J. RANDALL WYATT, JR.** |
| **JASPER D. LEWIS,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | **(Direct Appeal; First Degree Murder** |
| | ) | **and One Count of Robbery)** |

FOR THE APPELLANT:

JEFFREY A. DEVASHER
Assistant Public Defender
(On Appeal)

DAVID BAKER
Assistant Public Defender
(At Trial)

JEFFERSON T. DORSEY
Assistant Public Defender
(At Trial)
1202 Stahlman Building
Nashville, TN  37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

KAREN M. YACUZZO
Assistant Attorney General
425 5th Avenue N.
Nashville, TN  37243

VICTOR S. JOHNSON
District Attorney General

KATRIN MILLER
Assistant District Attorney
222 Second Avenue, North
Suite 500
Nashville, TN  37201

OPINION FILED _____

AFFIRMED

JERRY L. SMITH, JUDGE

# OPINION

On September 14, 1995, a Davidson County jury convicted Appellant Jasper D. Lewis of one count of first degree murder and one count of robbery. The trial court subsequently sentenced Appellant as a Range I standard offender to consecutive terms of life imprisonment for the first degree murder conviction and five years for the robbery conviction. Appellant challenges both his convictions and his sentences, raising the following issues:

> 1) whether the evidence is sufficient to support Appellant's convictions for first degree murder and robbery;
> 2) whether the trial court should have suppressed a statement that Appellant made to police;
> 3) whether the trial court should have suppressed the pre-trial identification of Appellant by one of the State's witnesses;
> 4) whether the trial court erred when it instructed the jury about the minimum number of years that Appellant would have to serve for each offense before he would become eligible for parole;
> 5) whether the trial court imposed an excessive sentence for the robbery conviction; and
> 6) whether the trial court erred when it ordered the sentences to be served consecutively.

After a review of the record, we affirm the judgment of the trial court.

## I. FACTS

Daniel McKell testified that on October 28, 1994, he and Fernando Johnson were sitting in front of an apartment building on Buchanan Street in Nashville, Tennessee, with some other individuals. Johnson eventually left this group and joined Appellant and Sam Hall in a dice game about thirty to forty feet away from McKell. Appellant was wearing dark clothing and he had black and white beads in his hair.

McKell testified that while he was talking to some other individuals, he heard some gunshots. When McKell looked in the direction of the dice game, he saw Appellant shoot Johnson, who was on his knees shooting dice. McKell heard a total of four or five shots. At this point, McKell ran to the other side of the apartment building.

McKell testified that later that night, he gave the police a description of Appellant. A few days later, McKell identified the photographs of Appellant and Hall out of two groups of photographs that were shown to him by the police. McKell also testified that he could not remember whether he had seen Appellant's photograph on television before he identified the photograph of Appellant shown to him by the police.

Robert Davidson, Jr., testified that he was about twenty feet away from the dice game when the shooting occurred. Davidson estimated that Johnson had been playing dice for thirty to forty-five minutes before he was shot.

Samuel Hall testified that he and Appellant drove to the apartments on Buchanan Street at some time around 9:30 p.m. on the night of the shooting. Hall, Appellant, Johnson, and Quenton Carrethers eventually began playing a game of dice. During the dice game, Johnson won some money from Appellant. Hall testified that Johnson and Appellant were engaging in "regular trash talk" during the dice game.

Hall testified that while Johnson was on his knees picking up the money on the ground in front of him, Appellant shot Johnson in the head. Appellant then

shot Johnson four times in the back and then took money that was in Johnson's hand. At this point, Hall ran back to the car that he had driven to the apartment building. After Hall had driven about three blocks from the scene of the shooting, he saw Appellant. Appellant then got in the car and Hall drove to Appellant's girlfriend's residence. Hall testified that when he stated that Appellant had killed Johnson, Appellant replied, "I ain't worried about it. That's just one less nigger I have to worry about."

Hall testified that when he and Appellant arrived at Appellant's girlfriend's residence, Appellant changed his clothes, took the beads out of his hair, and then washed his gun and the money that he had taken from Johnson. After Appellant reloaded his gun, Hall and Johnson went to another friend's house where Appellant asked someone to call his grandmother. Appellant and Hall then went back to Appellant's girlfriend's residence where Appellant met his mother and his mother drove him away in her car.

Joyce Baker, Appellant's mother, testified that on the night of the shooting, she took a gun away from Appellant. Baker threw the gun in a dumpster the next day, but she eventually contacted the police and assisted them in recovering the gun. Baker also testified that on the night of the shooting, she advised Appellant to travel to Indiana to stay with his father. When Baker later learned that a warrant had been issued for Appellant's arrest, she called Appellant and told him to come back to Nashville. After Appellant returned to Nashville, Baker took him to police headquarters.

Detective Brad Putnam of the Metro Police Department testified that he was present when police officers recovered a .380 automatic handgun from a dumpster on October 30, 1994.

Agent Tommy Heflin of the Tennessee Bureau of Investigation testified that he had compared the shell casings and bullets found at the scene of the shooting and the bullets recovered from the body of Johnson with the .380 automatic handgun. Agent Heflin concluded that the bullets and casings were fired from the gun.

Detective Mike Smith of the Metro Police Department testified that on October 30, 1994, Appellant's mother brought Appellant to police headquarters. Smith then advised Appellant of his constitutional rights and Appellant agreed to waive his rights and make a statement.

In the statement that he gave to police, Appellant initially claimed that someone else had killed Johnson after Appellant quit playing dice and walked away. However, Appellant eventually admitted that he shot Johnson with a .380 automatic handgun. Appellant also admitted that after he shot Johnson, he took Johnson's money that was on the ground. Appellant stated that although he and Johnson called each other names, Johnson never threatened him. Appellant also stated that although he accused Johnson of cheating during the dice game, that was not why he shot Johnson. Appellant stated that he did not know why he shot Johnson.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant contends that evidence is insufficient to support his convictions for first degree murder and robbery. We disagree.

When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with Appellant to demonstrate the insufficiency of the convicting evidence. Id. On appeal, "the [S]tate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Id. Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996). Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." State v. Matthews 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Finally, Rule 13(e) of the Tennessee Rules of Appellate Procedure

provides, "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact beyond a reasonable doubt."

## A. First Degree Murder Conviction

Appellant contends that the evidence is insufficient to support his conviction for first degree murder because the State failed to establish that he killed Johnson with premeditation and deliberation.

When Johnson was killed in 1994, Tennessee's first degree murder statute provided that "[f]irst degree murder is: [a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (1994).[1] Premeditation requires a showing of a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Deliberation requires that the offense be committed with cool purpose, free of the passions of the moment. Id. Although premeditation "may be formed in an instant, deliberation requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.'" State v. Brown, 836 S.W.2d 530, 538 (Tenn. 1992) (citation omitted). While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, more than a "split-second" of reflection is required in order to satisfy the elements of premeditation and deliberation. Id. at 543.

_____

[1]A 1995 amendment eliminated deliberation as an element of first degree murder. See Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1998) ("First degree murder is: A premeditated and intentional killing of another.").

The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Tennessee courts have delineated several circumstances that may be indicative of premeditation and deliberation, including the use of a deadly weapon upon an unarmed victim, Brown, 836 S.W.2d at 841; facts from which motive may be inferred, Bordis, 905 S.W.2d at 222; and calmness immediately after the killing, Bland, 958 S.W.2d at 660.

Considering the proof in the record in the light most favorable to the State, as we are required to do, we hold that the evidence is sufficient to establish premeditation and deliberation. First, the record indicates that Johnson was unarmed when Appellant shot him with an automatic handgun. In addition, McKell and Hall both testified that Johnson was on his knees when Appellant shot him. Further, the record indicates that Appellant placed his gun either against or very near Johnson's head when he shot him. Second, the State introduced evidence from which a jury could infer that Appellant had a motive for killing Johnson. The record indicates that during the thirty to forty-five minute dice game, Johnson won most of the bets and took money from several people, including Appellant. In addition, Hall testified that after Appellant shot Johnson, Appellant took Johnson's money that was on the ground. In fact, Appellant admitted in his statement to the police that after he shot Johnson, he took Johnson's money that was on the ground. A rational jury could infer from these facts that Appellant had killed Johnson in order to take his money. Third, the record indicates that immediately after the killing, Appellant was calm. Indeed, Hall testified that when he picked up Appellant shortly after the killing and told

Appellant that Johnson was dead, Appellant replied, "I ain't worried about it. That's just one less nigger I have to worry about." Shortly thereafter, Appellant went to his girlfriend's residence, changed his clothes, took the beads out of his hair, washed the blood off his gun and the money that he had taken from Johnson, and then went with Hall to the residence of another friend. In short, a rational jury could conclude from these circumstances that Appellant decided to kill Johnson and then reflected on that decision with cool purpose for some period that was at least more than a "split-second" before he shot and killed Johnson. This issue has no merit.

### B. Robbery Conviction

Appellant contends that the evidence is insufficient to support his conviction for robbery. Under Tennessee Code Annotated section 39-13-401(a), "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code. Ann. § 39-13-401(a) (1994). Appellant claims that the evidence is insufficient to convict him under this statute because the only evidence that he had taken anything from Johnson came from the testimony of Hall, and this testimony was contradicted by Hall's previous statement to police.

The general rule in Tennessee is that "contradictory statements by a witness in connection with the same fact cancel each other." State v. Matthews, 888 S.W.2d 446, 450 (Tenn. Crim. App. 1993) (citations omitted). However, "[t]his rule of cancellation applies only when inconsistency in a witness' testimony

is unexplained and when neither version of his testimony is corroborated by other evidence." Id. (citation omitted).

Initially, we note that it is not clear that Hall's testimony at trial and his pre-trial statement to police were contradictory. The record indicates that during Hall's direct examination, the following colloquy occurred:

> A: He went into the bedroom. When he went to the bedroom, he went to go get some clothes, to change his clothes. Then he went into the bathroom to wash his gun and wash the money.
> Q: Washing the gun and washing the money?
> A: Yes, sir.
> Q: What money are you talking about?
> A: The money that he took from Fernando Johnson.
> Q: When did he do that?
> A: When he was—when he shot him in the head, he shot him like four more times in the back. He flipped him over and went inside his pockets.
> Q: And was there money in Fernando's pockets?
> A: Yes, sir.
> Q: How did you see that?
> A: Because when he was pulling it out, the only thing I seen was, you know, there was some money in front of him, the money he was counting. Then he had some money in his pocket. So I seen him when he grabbed the money in his hand. Then I seen him when he was going through his pockets.

The record also indicates that the following colloquy occurred during the cross-examination of Detective Smith:

> Q: So Sam Hall told you that he did not see—if you remember back and think about it, he told you that he did not see Jasper Lewis take anything or go through the victim's pockets.
> A: I'm sorry. I stand to be corrected, sir. You confused me. I thought Hall himself said he didn't rummage through the pockets, but he said that—he said that Jasper rolled Fernando over and went through his pockets.
> Q: It's true, is it not, Detective, that in that taped statement, Sam Hall told you he did not see Jasper Lewis take any money from Fernando Johnson.
> A: You know, I haven't listened to that taped statement in a while. This is a summary. Now, as far as the money, I don't know. Going through his pocket, I'm—I'm sure I'm correct by my transcripts here. So if—if the answer is I don't have any indication here of money being taken. Just going through his pockets.

-10-

Q: All right. Well, I believe what—what Sam Hall told you, isn't it correct, that—that Jasper, according to Sam, rolled him over, but didn't see him take any money out of the pockets?
A: Apparently so.
Q: Okay. So the answer is yes.
A: Yes.

Contrary to Appellant's assertion, this evidence merely establishes that Hall's testimony at trial was somewhat inconsistent with Detective Smith's written summary of Hall's pre-trial statement, not that Hall actually made a contradictory statement. When Smith testified, he did not have Hall's actual statement and thus, Smith could only testify that the summary did not contain "any indication . . . of money being taken." Further, when Hall was asked about his pre-trial statement during cross-examination, he denied telling the police that Appellant did not take any money from Johnson.

Further, even if this evidence had established that Hall had made two contradictory statements, the statements would not cancel each other out because Hall's testimony that he saw Appellant take Johnson's money that was on the ground was corroborated by other evidence. See id. Indeed, Appellant admitted to police in his pre-trial statement that after he shot Johnson, he took Johnson's money that was on the ground.

Finally, Appellant contends that the evidence is insufficient because Hall's testimony was contradicted by other witnesses who testified that they saw Hall, and not Appellant, rummaging through Johnson's pockets. However, "[t]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the

-11-

jury as the triers of fact." State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998). The jury obviously believed Hall. This issue has no merit.

## III. APPELLANT'S PRE-TRIAL STATEMENT

Appellant contends that the trial court erred when it denied his motion to suppress the pre-trial statement that he made to police. Specifically, Appellant claims that his statement was inadmissible under the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution because the statement was given involuntarily. We disagree.

The Fifth Amendment to the United States Constitution provides in part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. However, an accused may waive this right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In Miranda, the United States Supreme Court held that a suspect

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479, 86 S.Ct. at 1630. The Supreme Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of these rights. Id. Accordingly, a constitutional waiver of the right against self-incrimination requires the accused to make an intelligent,

-12-

knowing, and voluntary waiver of the rights afforded by <u>Miranda</u>. <u>Id.</u> 384 U.S. at 444, 86 S.Ct. at 1612. A court may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver. <u>State v. Stephenson</u>, 878 S.W.2d 530, 545 (Tenn. 1994) (citations omitted).

At the suppression hearing, Detective Smith testified that before Appellant made his statement, Smith read Appellant's constitutional rights to him. Smith testified that Appellant then stated that he understood his rights and he signed a waiver of rights form. Appellant testified that Smith read his constitutional rights to him, but he claimed that he did not understand his rights.

Appellant claims that his statement was involuntary because he was under the influence of marijuana when he gave the statement. Although Appellant testified that he had used marijuana at 6:00 or 7:00 a.m. on the day that he made the statement, he admitted that he never told Smith about this drug use when he made his statement at 4:40 p.m. When asked whether he was still intoxicated when he made the statement, Appellant replied that he still had "some symptoms" and he was depressed. However, Smith testified that Appellant stated that he was not under the influence of drugs and he did not appear to be under the influence of alcohol or drugs when he made the statement. After listening to this testimony, the trial court stated that even if it was true that Appellant had smoked marijuana at 7:00 a.m. on the day that he made the statement, there was no basis for finding that Appellant was still under the influence of marijuana when he made the statement.

Appellant also claims that his statement was involuntary because it was coerced. Appellant testified that Detective Smith told him that if he did not give the police something to help their case, they would charge Appellant's mother as an accessory to murder. Appellant also testified that during a five minute break that was not recorded, Smith reminded him that murder carried a possible penalty of death. However, Smith testified that there was never an unrecorded five minute break in the interview and he denied even mentioning the death penalty. Smith also denied that he ever threatened to charge Appellant's mother as an accessory. After listening to this testimony, the trial court found that Smith had never mentioned the death penalty or threatened to charge Appellant's mother. Thus, the trial court found that under the totality of the circumstances, Appellant's statement was voluntarily made after a valid waiver of his rights.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The evidence in this case does not preponderate against the trial court's findings. This issue has no merit.

## IV. PRE-TRIAL IDENTIFICATION OF APPELLANT BY A STATE WITNESS

Appellant contends that the trial court erred when it denied his motion to suppress the pre-trial identification of Appellant by McKell. Specifically, Appellant claims that the identification was inadmissible because the identification procedures used by the police were unduly suggestive. We disagree.

The United States Supreme Court has stated that due process is violated if an identification procedure was so suggestive as to give rise to "a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). However, the Supreme Court has also stated that even when pre-trial identification procedures are found to be suggestive, out-of-court and in-court identifications may still be admissible if the identification was reliable. Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). It is the likelihood of misidentification that violates due process and renders the identification inadmissible. Id. In Neil, the Supreme Court listed the factors to be considered in determining whether the identification was too unreliable to be admitted into evidence:

1. the opportunity of the witness to view the criminal at the time of the crime;
2. the witness' degree of attention at the time of the crime;
3. the accuracy of the witness' prior description;
4. the level of certainty demonstrated at the confrontation;
5. the length of time between the crime and the confrontation.

409 U.S. at 199–200, 93 S.Ct. at 382.

Initially, Appellant argues that the photographic line-up used by McKell to identify Appellant was improperly suggestive because the photograph of Appellant is the only one in which the subject is wearing a red shirt. We cannot agree that the photographic line-up was unduly suggestive merely because Appellant was the only subject wearing a red shirt. We have reviewed the photographic array shown to McKell, and although Appellant is the only man wearing a red shirt, we note that no one color predominates. Indeed, the photographic line-up consists of three men wearing navy blue or black shirts, two men wearing white shirts, and one man wearing a red shirt. In addition, all six

men are African-American, appear to be of the same age, and have similar facial features. Thus, we agree with the trial court that although it may have been preferable if all six men had been wearing the same color shirt, the fact that they were not does not mean that the line-up was unduly suggestive. See State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (stating that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar" to the defendant) (citation omitted).

Appellant also argues that the photographic line-up was unduly suggestive because it contained the same photograph of Appellant that McKell had seen on television before he was shown the line-up. However, the record indicates that although Appellant introduced evidence at the suppression hearing that a photograph of Appellant was shown on television, Appellant failed to introduce evidence at the hearing showing that it was the same photograph that was used in the line-up. Although Appellant introduced evidence at trial that it was the same photograph, the trial court accredited McKell's testimony that he had not seen the photograph on television, even though McKell's mother testified that she believed that he had seen it.

Even if the photographic line-up could be considered improperly suggestive, evidence of the identification by McKell would still be admissible under the test set forth by the Supreme Court in Neil. First, the record indicates that McKell had a good opportunity to view Appellant at the time of the shooting. McKell testified that he initially observed Appellant for fifteen to thirty minutes and he then periodically observed Appellant for another hour while Appellant was playing dice. McKell also testified that although it was night, there was a bright

light in the area. Second, the record indicates that McKell was paying attention to Appellant on the night of the shooting. Although McKell admitted that he had no real reason to pay attention to Appellant before the shooting occurred, McKell denied that he never got a good look at Appellant. Third, the record indicates that McKell had given an accurate description of Appellant. Indeed, the record indicates that on the night of the shooting, McKell told the police that the shooter had braids with beads in them, was wearing dark clothes, and had darker skin than the other man he was with. The record also indicates that McKell gave this description before Appellant's photograph was shown on television. Fourth, the record indicates that McKell identified Appellant's photograph as soon as the line-up was shown to him. Finally, the record indicates that the identification was reliable because it took place only five days after the shooting. See, e.g., State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993 ) (holding that identification that took place one week after the crime was reliable). In short, we hold that the photographic line-up was not so suggestive that introduction of evidence about McKell's identification of Appellant's photograph and McKell's subsequent in-court identification of Appellant violated due process. This issue has no merit.

## V. JURY INSTRUCTIONS

Appellant contends that the trial court erred when it instructed the jury pursuant to Tennessee Code Annotated section 40-35-201 about the time period that Appellant would be required to serve before he would be eligible for parole. Specifically, Appellant claims that section 40-35-201 is unconstitutional. We disagree.

The record indicates that before trial, Appellant filed several motions requesting jury instructions about the possible range of punishment for each of the charged offenses as well as all lesser included offenses. At the same time Appellant filed these motions, Appellant also filed a motion stating that the trial court should not instruct the jury about parole eligibility pursuant to section 40-35-201 because that section was unconstitutional. In response to Appellant's motion, the trial court cautioned Appellant that the requested instructions about range of punishment would require the court to comply with section 40-35-201 and also instruct the jury about parole eligibility. At the close of trial, the court instructed the jury about both the possible range of punishment and parole eligibility for the various offenses.

When Johnson was killed in 1994, Tennessee Code Annotated section 40-35-201 provided, in relevant part:

> (b)(1) In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses.
>> (2)(A)(i) When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses. Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date. Such calculation shall include such factors as the release eligibility percentage established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.
>>> (ii) Such instructions to the jury shall also include a statement that whether a defendant is actually released from incarceration on the date when such defendant is first eligible for release is a discretionary decision made by the board of paroles based upon many factors, and that such board has

the authority to require the defendant to serve the entire sentence imposed by the court.

(B) On an annual basis, the department of correction shall provide each judge exercising criminal trial court jurisdiction with the approximate calculation required in subdivision (2)(A). Such calculation shall be broken down to show the effect of each factor used in making such calculation. If the calculation provided by the department to the judges changes because of a change in the law or correctional policy, court intervention, the governor's prison overcrowding policy or any other such circumstance, the department shall send a revised calculation to the judges as such changes occur.

Tenn. Code Ann. § 40-35-201 (1994).[2] Appellant contends that this statute is unconstitutional because it is unconstitutionally vague, it violates due process, it deprives defendants of impartial juries, and it constitutes an unconstitutional attempt by the legislature to exercise judicial powers. However, the Tennessee Supreme Court has previously analyzed and rejected identical arguments. See State v. King, 973 S.W.2d 586 (Tenn. 1998). Indeed, the supreme court specifically held that this statute was not unconstitutionally vague, id. at 590; that an instruction under this statute did not violate due process by misleading the jury, id. at 592; that an instruction under this statute did not violate due process by depriving the defendant of an impartial jury, id. at 588 n.4; and that this statute does not violate the Separation of Powers Clause of the Tennessee Constitution, id. at 592. This issue has no merit.

## VI. LENGTH OF SENTENCE

---

[2]A 1998 amendment rewrote subsection (b) to provide:
In all contested criminal cases, except for capital crimes which are governed by the procedures contained in §§ 39-13-204 and 39-13-205, and as necessary to comply with the Constitution of Tennessee, article VI, section 14, and § 40-35-301, the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses.
Tenn. Code Ann. § 40-35-201(b) (Supp. 1998).

Appellant contends that the trial court erroneously sentenced him to a longer term than he deserves for the robbery conviction. We disagree.

"When reviewing sentencing issues . . . including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (1997). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the defendant's statements, the nature and character of the offense, and the defendant's potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -210(b) (1997 & Supp. 1998); Ashby, 823 S.W.2d at 169. "The defendant has the burden of demonstrating that the sentence is improper." Id. Because the record in this case indicates that the trial court did not properly consider the sentencing principles and all relevant facts and circumstances, our review is *de novo* without a presumption of correctness.

Initially, we note that robbery is a Class C felony. See Tenn. Code Ann. § 39-17-401(b) (1997). The sentence for a Range I offender convicted of a Class C felony is between three and six years. Tenn. Code Ann. § 40-35-112(a)(3) (1997). When there are enhancement but no mitigating factors, the court may

set the sentence above the minimum within the applicable sentencing range. Tenn. Code Ann. § 40-35-210(d) (1997). When both enhancement and mitigating factors are applicable to a sentence, the court is directed to begin with the minimum sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Tenn. Code Ann. § 40-35-210(e) (1997).

In sentencing Appellant to a term of five years for his robbery conviction, the trial court determined that enhancement factor (1) applied because Appellant had a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range, that enhancement factor (4) applied because the victim of the offense was particularly vulnerable due to age, and that enhancement factor (8) applied because Appellant had a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(1), (4), & (8) (1997). Although the record is not entirely clear, the trial court apparently determined that none of the enumerated mitigating factors of Tennessee Code Annotated section 40-35-113 applied.

Appellant does not challenge the application of enhancement factor (1), and we conclude that it was correctly applied. Indeed, the record indicates that Appellant has previous convictions for attempted burglary, driving on a revoked license, reckless driving, a weapons offense, and two convictions for theft. We conclude in our *de novo* review that this factor is entitled to significant weight.

Appellant similarly does not challenge the application of enhancement factor (8), and we also agree that this factor was correctly applied. Indeed, the record indicates that Appellant has previously violated the terms of probation and that violation resulted in the revocation of his probation.

Appellant does challenge the trial court's application of enhancement factor (4). Specifically, Appellant contends that this factor should not have been applied because other than his age of fifteen years, there was no proof that Johnson had any particular vulnerability. We conclude that the trial court erred when it applied enhancement factor (4). As stated by this court in State v. Butler, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994),

> [A] victim is particularly vulnerable within the meaning of this enhancement factor when the victim lacks the ability to resist the commission of the crime due to age, a physical condition, or a mental condition. A victim is also particularly vulnerable when his or her ability to summons assistance is impaired; or the victim does not have the capacity to testify against the perpetrator of the crime. However, a finding that one of these conditions exists does not, as a matter of law, mean that this factor is automatically considered. The appellant must have taken advantage of one or more of these conditions during the commission of the crime. The state had the burden of establishing the limitations that render the victim "particularly vulnerable." The state also had the burden of establishing that the condition which rendered the victim "particularly vulnerable" was a factor in the commission of the offense.

Here, the state failed to meet its burden. There is no proof in the record that Johnson's age had any effect on his ability to resist commission of the robbery, on his ability to summon help, or his ability to testify against Appellant if he had not been killed. Further, there is no proof that Appellant took advantage of Johnson's age or any other condition when he shot him in the head and took his money. See, e.g., id. (holding that enhancement factor (4) did not apply in a murder case because the victim's age had nothing to do with resisting the unexpected firing of a gun).

Appellant also challenges the trial court's failure to apply any mitigating factors to his sentence. Specifically, Appellant contends that mitigating factor (6) applied in that Appellant lacked substantial judgment because of his youth. See Tenn. Code Ann. § 40-35-113(6) (1997). When determining the applicability of this mitigating factor, the sentencing court should consider "the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." State v. Adams, 864 S.W.2d 31, 33 (Tenn. 1993). In support of his contention, Appellant merely states that he was twenty years old at the time of the robbery. Appellant has failed to indicate how his age or anything else affected his judgment when he committed the robbery. Indeed, the record indicates that Appellant is acquainted with the criminal justice system and further, that he had the presence of mind to attempt to cover up his involvement in the crime by altering his appearance, washing the money and the gun, and reloading the gun to make it appear as though it had not been fired. Thus, mitigating factor (6) was not applicable.

The State contends that the trial court should have applied enhancement factor (6) because the injuries to the victim were particularly great and enhancement factor (9) because Appellant used a firearm in the commission of the robbery. See Tenn. Code Ann. § 40-35-114(6), (9) (1997). We agree. It goes without saying that death is a "particularly great" personal injury and further, it is undisputed that Appellant used a gun when he committed the robbery. Neither one of these factors is an element of or is inherent in the crime of robbery. See Tenn. Code Ann. § 40-35-401(a) (1997) ("Robbery is the intentional or knowing theft of property from the person of another by violence or

putting the person in fear."). Thus, we conclude that the trial court should have applied enhancement factors (6) and (9) to Appellant's sentence for robbery.

In our de novo review, we conclude that four enhancement and no mitigating factors apply to Appellant's sentence for robbery. Thus, we hold that a sentence of five years is entirely appropriate in this case. This issue has no merit.

## VII. CONSECUTIVE SENTENCING

Appellant contends that the trial court erred when it ordered his sentences to run consecutively. We disagree.

Consecutive sentencing is governed by Tennessee Code Annotated section 40-35-115. The trial court has the discretion to order consecutive sentencing if it finds that one or more of the required statutory criteria exist. State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Further, the court is required to determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

In imposing consecutive sentences, the trial court found that Appellant was a dangerous offender whose behavior indicates little or no regard for human life and who has no hesitation in committing a crime in which the risk to human life

-24-

is high. <u>See</u> Tenn. Code Ann. § 40-35-115(4) (1997). Specifically, the trial court stated that

> [T]he act that was committed[,] that the Jury accepted and returned their verdict on[,] has got to be one that would be done by a person whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. . . . [I]f a young man, kneeling down, rolling dice is shot one time in the head and four times in the back and left to die in a totally senseless, cruel[,] outrageous way, the person who does that[,] that this Jury found does that[,] has to be a person who considers very little regard in connection with their behavior for human life.

We agree that this brutal murder of a young man who was merely engaged in playing a game of dice demonstrates that Appellant is a dangerous offender who has little or no regard for human life and has no hesitation about committing a crime in which the risk to human life is high. Indeed, the record indicates that Appellant placed his gun on or very near the top of Johnson's head when Johnson was kneeling on the ground and then shot Johnson once in the head and four times in the back. Further, although the trial court made no express finding, we conclude in our *de novo* review that consecutive sentences are necessary to protect the public from future criminal conduct of Appellant. Indeed, Appellant's criminal record indicates that his criminal conduct has become more and more serious over time. In addition, his callous comment that Johnson was "just one less nigger [he had] to worry about" indicates that he poses a continuing threat to the public. Finally, the cruel and senseless nature of Appellant's conduct indicates that consecutive sentences are reasonably related to the severity of the offenses and are congruent with general principles of sentencing. This issue has no merit.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE

CONCUR:


_____
JOHN H. PEAY, JUDGE


_____
WILLIAM M. BARKER, SPECIAL JUDGE